IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | } | |
| | } | |
| VS. | } | CRIMINAL NO. H-05-126 |
| | } | |
| DELIA GOMEZ-MORENO | } | |

**OPINION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

On Friday, July 8, 2005, the Court held a hearing on the Motion to Suppress filed by Defendant Delia Gomez-Moreno. Immigration and Customs Enforcement (ICE) agent Gary Renick testified that around 4:30 pm on Sunday, February 27, 2005, he began a surveillance of a residence located at 3806 Kennon in Houston, Texas. The surveillance was established in response to an anonymous telephone call received on that day around 12 o'clock noon that there were 25 to 30 illegal aliens at the residence. Agent Renick testified that located at the address were a main residence and a detached out-building, sometimes referred to in the testimony as a "garage," behind the main residence. The garage had been converted into an apartment. Agent Renick observed a great deal of automobile traffic to and from the property, and he saw a Ford Thunderbird drive in and out of the driveway several times. Renick also observed a woman and two men outside at the front of the main residence. He testified that these individuals appeared to be acting as "lookouts". Renick's vantage point was not good enough to enable him to identify the persons entering or leaving the property, except that he could see the door to the garage /apartment open and shut, and he observed that the heads of persons who had been inside the automobiles driving into the driveway were not visible after the automobiles pulled away from the residence. A helicopter was also used to view the property, but without much success.

Around 6:35 pm, it was determined that no more could be learned of the situation from the surveillance, and that it was time to engage in a "knock and talk." This technique is used by officers to gain further consensual information from residents, and to obtain consensual searches. Around 6:45 pm, two teams made up of ICE agents and Houston Police officers approached the main residence and the garage/apartment, and each building was virtually surrounded. The team that approached the residence knocked loudly on the door and announced the presence of the police. There was no answer, although the agents could hear persons moving around inside. Defendant Gomez-Moreno testified that there was a large fish tank in front of the front door, and that it was not used for ingress or egress from the building. Meanwhile, the rear garage/apartment building was also being knocked on by agents. From the window into the garage/apartment, the agents could see approximately ten to twelve persons inside. Nevertheless the knocking raised no response. Around this time, one of the persons located inside the front residence exited the back door, and was seen by the agents who were at the garage/apartment. The person who exited the door immediately turned and re-entered the home when he saw the police and agents at the back. The agents followed him inside. Renick testified that the agents proceeded to secure the building because they were unsure of who was in the building, whether the persons inside were armed, or what actions those inside the residence would take. The twelve persons who were inside the front residence were brought out into the back yard located between the residence and the garage/apartment. Defendant Gomez-Moreno was asked by the agents if she owned the property, and she responded that she did. She was very cooperative and agreed to speak with the agents. She also gave her verbal consent to search the premises. Gomez-Moreno also signed a consent to search form authorizing a search of the premises located at 3806 Kennon Street, Houston, Texas 77009 at 7:30 pm on the evening of February 27, 2005. The consent was obtained by ICE Agents Juan Castillo and Gary Renick after both the front residence and garage apartment had been secured.

The agents had heard sounds consistent with people in the garage/apartment barricading the door. They asked Gomez-Moreno to help convince the people inside to open the door, which she did. Shortly after several persons had been brought out of the garage/apartment, the ceiling of the dwelling fell, revealing additional aliens hiding in the crawl space. There were thirteen people found in the garage/apartment.

ICE agent J. C. Castillo testified that on Sunday evening he brought Gomez-Moreno to a table in her home and asked her to give a statement. She had been *Mirandized*. She gave a verbal statement in English, which she speaks with some fluency, and the verbal statement was written down by Agent Castillo. After Castillo wrote the statement down, Gomez-Moreno read and signed the statement. In her statement, Gomez-Moreno said that she had met Nemecio Rubio in December 2004 when she asked him to smuggle someone into the United States for her. In January 2005, she rented the garage/apartment to Rubio for $700 per month, and was aware that Rubio was keeping illegal aliens in the garage/apartment. On February 26, 2005, Rubio offered to pay Gomez-Moreno $50 per alien to keep fourteen aliens in her home on that day, and she agreed. Three other persons assisted Rubio in these endeavors, and she identified all three from photo spreads shown to her by Agent Castillo. Her affidavit was executed by Gomez-Moreno at the ICE offices, located at 126 Northpoint Drive, Houston, Texas, on February 28, 2005.

In her Motion to Suppress, Gomez-Moreno argues that her Fourth Amendment Right to be secure in her person and in her property was violated by the agents when they entered her residence, searched it, and arrested her without a warrant. A warrantless intrusion into an individual's residence is presumed to be unreasonable unless the person consents or probable cause coupled with exigent circumstances justify the entry. The agents did not have a search warrant for either building at the location. The Government maintains that there were probable cause and

exigent circumstances at the time the residence was entered.  In addition, the Government argues that the consent to search was valid and was not coerced.

The agents maintain, and it is fair to conclude, that they had no probable cause to obtain a search warrant at the time of the surveillance.  They were in the possession of an anonymous tip, and the surveillance did not give them enough information to establish probable cause.  The next step, "the knock and talk" technique, is a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect there is criminal activity.  *United States v. Jones*, 239 F3rd 716, 719 (5th Cir 2001).  The officers were not successful in the knock and talk because there was no answer to either door knocked upon.  Rather, an individual exited the back door of the front residence and, when seeing the police outside, immediately ran back in.  This situation created an exigent circumstance, when coupled with the activity going on outside the house on the day of the surveillance, the anonymous information that triggered the surveillance, and the fact that officers at the rear dwelling saw a number of people inside the rear dwelling.  "The possibility that evidence will be removed or destroyed, the pursuit of a suspect, and immediate safety risk to officers and others are exigent circumstances that may excuse an otherwise unconstitutional entrance into a residence." 239 F3rd at 720.

Defendant argues that these exigent circumstances were manufactured by the agents, and that they should have obtained a search warrant, but before the individual exited the residence, and then ran back inside, there was insufficient evidence of probable cause that a crime had been or was being committed. The exigent circumstances were not created by the agents in surrounding the residence and garage/apartment and knocking on the door.  Rather, it was the attempted exiting of one of the persons inside the residence that gave rise to these exigent circumstances. As Judge Sutton said in his dissent in *United States v. Chambers*, 395 F3rd 563, 570 (6th Cir. 2005), "That is not the way law abiding citizens generally react to an encounter with the police."  The search of

the residence was not conducted at that time. Rather, the agents who followed the exiting person back inside the house secured the house for the safety of those inside and the safety of the agents. It was only after a consent to search was obtained from Gomez-Moreno that the house was searched. Shortly after the residence was secured, Mrs. Gomez-Moreno cooperated with the agents in getting the individuals in the garage/apartment out of the apartment. In sum, there were both exigent circumstances and probable cause that allowed the agents legally to enter the residence.

The consent to search was obtained after Gomez-Moreno was arrested and *Mirandized*. It was obtained after she cooperated with the agents in getting the persons inside the garage/apartment out into the back yard.

In assessing the voluntariness of a consent to search, there are six factors which must be addressed. (1) The voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of her right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Alsibor*, 103 F3rd 1023, 1038 (5th Cir. 1997). Although Gomez-Moreno was in custody, she was asked for her cooperation by the agents, and she readily gave it. Although she testified that in her heart of hearts she did not want to sign the consent, she did not testify that she was coerced into signing the consent. She also did not testify that she did not know she could not have refused to give consent. She was responsible for getting the inhabitants in the back garage/apartment out of the garage/apartment, and the next day she signed a statement setting forth her role in the transaction. By that time she had been *Mirandized* twice. Her attorney argues that she had only a ninth grade education in Mexico and was not of a sufficient level of education or intelligence to appreciate her rights under the circumstances, but Gomez-Moreno came to the United States speaking no English, and was capable of expressing herself clearly without an interpreter in the English language. She

also testified intelligently concerning what transpired at her house that day.  The Court finds that Gomez-Moreno's consent to search was voluntarily given, and she was not coerced into signing the consent to search.

Accordingly, it is hereby **ORDERED** that the Motion of Delia Gomez-Moreno to Suppress the evidence of a warrantless search and seizure is hereby **DENIED**.

Signed at Houston, Texas, this 13th day of July, 2005.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE